431 So.2d 1011 (1983)
Douglas Bret WHIPPLE, Appellant,
v.
STATE of Florida, Appellee.
No. 82-1710.
District Court of Appeal of Florida, Second District.
March 9, 1983.
Rehearing Denied May 13, 1983.
*1012 H. Dohn Williams, Jr., of Varon & Stahl, P.A., Hollywood, for appellant.
Jim Smith, Atty. Gen., Tallahassee, and William I. Munsey, Jr., Asst. Atty. Gen., Tampa, for appellee.
PER CURIAM.
Affirmed.
GRIMES, A.C.J., and SCHEB and RYDER, JJ., concur.

ON MOTION FOR REHEARING
PER CURIAM.
Appellant was convicted of drug trafficking and carrying a concealed firearm. We affirmed the trial court and issued a per curiam affirmance, commonly referred to as a PCA. Appellant has filed a motion for a rehearing asking the court to reconsider points he previously briefed and argued. Additionally, he complains of this court's failure to write an opinion. The motion for rehearing must be denied; however, we take the occasion to address the function of a motion for rehearing and to explicate why counsel cannot reasonably expect a written opinion from this court in all affirmances of lower tribunals.
Appellant, on rehearing, focuses on two of the five points he previously argued: first, that his own testimony established his defense of coercion and duress as a matter of law; and second, that there was insufficient evidence of his knowledge of the presence of the contraband to uphold the jury's finding that he possessed it. After reviewing the record and briefs and listening to oral argument, we found no merit in appellant's position on these or the other points he raised. On the first point we concluded that while there was evidence from which the jury could have found that appellant was coerced or acted under duress, the jury did not err in rejecting that defense. The jury was instructed as to the circumstances under which coercion and duress may be a defense, and there was no attack on the correctness of the court's instruction. On the second point, we determined that the evidence was sufficient for the jury to conclude that appellant had knowledge of the contraband that was contained in his own plane which he was flying en route from Jamaica to Florida.
Having concluded that appellant's conviction and sentence should be affirmed, we decided that to write an opinion in this case would merely serve to refute appellant's arguments and would not show any conflict in law which would merit an application for discretionary review to the supreme court. Furthermore, an opinion would not have been of any significant assistance to the bench or bar of this state.
At the outset of this discussion, we wish to point out that we have not singled out *1013 appellant's motion for rehearing as being any less meritorious than many other similar motions filed in this court. Rather, we have taken this occasion to speak generally to the bar, and particularly to those who practice before this court, because our experience indicates that for many practitioners a motion of this type has become a routine step in appellate practice. In 1982, for example, motions for rehearing were filed in about one out of every four cases we heard on the merits. With very few exceptions they were denied.
Florida Rule of Appellate Procedure 9.330 governs motions for rehearing or for clarification. Subsection (a) provides:
A motion for rehearing or for clarification of decision may be filed within 15 days of an order or within such other time set by the court. The motion shall state with particularity the points of law or fact which the court has overlooked or misapprehended. The motion shall not re-argue the merits of the court's order. A reply may be served within 10 days of service of the motion.
From our experience, most motions for rehearing or clarification contain a condensed version of all or some of the points previously argued. Frequently, such motions urge the court to reconsider matters previously considered, or to write an opinion to refute contentions of counsel. Occasionally, the motion is misused by attorneys merely to express their displeasure with the court's judgment.
This leads to our first point: counsel should carefully and seriously consider the necessity or desirability of asking the court to rehear a case.
Shortly after the district courts of appeal were established, Judge Wigginton, in State v. Green, 105 So.2d 817 (Fla. 1st DCA 1958), cert. discharged, 112 So.2d 571 (Fla. 1959), addressed the function of a motion (then petition) for rehearing and noted:
Certainly it is not the function of a petition for rehearing to furnish a medium through which counsel may advise the court that they disagree with its conclusion, to reargue matters already discussed in briefs and oral argument and necessarily considered by the court, or to request the court to change its mind as to a matter which has already received the careful attention of the judges, or to further delay the termination of litigation.
105 So.2d at 818, 819.
We recommend that counsel carefully review Judge Wigginton's well articulated views in Green prior to filing a motion for rehearing. We subscribe to those views and urge counsel to file a motion only where careful analysis indicates a point of law or a fact which the court has overlooked or misapprehended, or where clarification of a written opinion is essential. Counsel should not use such motion as a vehicle to reargue the merits of the court's decision or to express displeasure with its judgment.
The second matter we address is the appellant's contention, and one frequently made by other counsel, that he cannot invoke the supreme court's discretionary review because of our failure to write an opinion.
Appellant argues that by our having issued a PCA, we have thwarted his right to obtain review in the supreme court. The fallacy of this contention is that under our constitution he did not have such a "right" of review in the supreme court in the first place. While Florida guarantees each litigant a right of review, that guarantee does not extend to having the supreme court hear each appeal. With Florida's rapidly growing population and enormous appellate caseload, if every litigant had a right of review in the supreme court, the court would be so overwhelmed that it could not possibly focus on the important cases.[1] In fact, this was one of the principal reasons *1014 which led to the creation of the district courts of appeal in 1957. When the supreme court caseload reached 1,225 cases in 1955, the Judicial Council of Florida proposed creation of the district courts of appeal. Their objective was to restrict access to the Supreme Court of Florida in order to avoid double appeals and to make appellate justice more readily available to litigants by hearing appeals near the source.[2] The legislature agreed, and on November 6, 1956, the voters overwhelmingly adopted an amendment to Article V of the Florida Constitution providing for creation of the district courts of appeal.[3] It was originally intended that the district courts were to have final appellate jurisdiction in most cases.[4] However, this finality eroded as the supreme court began looking to trial records, rather than to district court holdings to establish conflict jurisdiction.[5] The landmark case, of course, was Foley v. Weaver Drugs, Inc., 177 So.2d 221 (Fla. 1965). As the finality of the district courts continued to erode, the supreme court caseload, which had decreased to 555 in 1959,[6] became even more staggering with 2,676 cases filed in that court in fiscal year 1978-79.[7] About half of those were petitions for conflict certiorari. As a result of considerable study, an amendment to Article V of the Florida Constitution was proposed to revise the jurisdiction of the supreme court and district courts of appeal. The amendment was adopted by the voters on March 11, 1980.[8] The amendment limits the supreme court's mandatory review of district court of appeal decisions to those declaring invalid a state statute or provision of the state constitution. It provides for discretionary review of district court decisions declaring valid state statutes or expressly construing a provision of the state or federal constitution or affecting a class of constitutional or state officers. Discretionary review is also given in those cases which expressly and directly conflict with the decision of another district court of appeal or the supreme court on the same question of law. The supreme court may no longer search into the "record proper" to determine whether a district court affirmance creates a necessary conflict.[9]See, Jenkins v. State, 385 So.2d 1356 (Fla. 1980); Dodi Publishing Co. v. Editorial America, S.A., 385 So.2d 1369 (Fla. 1980). Thus, the district courts of appeal now have final appellate jurisdiction in most cases, as was originally intended.
Under our present constitutional scheme, the district courts of appeal engage primarily in the so-called error-correcting function to insure that every litigant receives a fair trial. This frees the supreme court to discharge its judicial policy-making function of clarifying the law and promulgating new rules of law. These are matters which have an impact on those other than the individual litigants. District courts can now certify matters "of great public importance" or decisions "in direct conflict" with the decision of another district court of appeal. *1015 Moreover, the district courts can also certify trial court judgments which are "of great public importance" or which have "a great effect on the proper administration of justice throughout the state" as needing "immediate resolution by the supreme court."[10] As recently pointed out by Justice Overton, "[t]he real effect of the amendment is the substantial reduction in the amount of time the supreme court spends on its screening responsibility," relieving an overworked state supreme court.[11]
We recognize that if we decide a case without writing an opinion, the losing party will be unable to obtain further review in the supreme court. Therefore, we endeavor to write opinions in all cases in which we believe that our decision can arguably be in conflict with a prior decision of the supreme court or a district court of appeal. To be ever faithful to this practice, there have been cases in which we first decided a case without opinion but, upon rehearing, determined to write an opinion in order to distinguish the cases relied on by the losing party. See, e.g., Fortman v. Freedom Federal Savings and Loan Assoc., 403 So.2d 985 (Fla. 2d DCA), petition for review denied, 402 So.2d 609 (Fla. 1981). In Fortman we wrote because we felt the cited cases were close enough on point that the losing party could make a legitimate argument to the supreme court that we had improperly distinguished them from the case at hand. The fact remains, however, that most of the cases cited by zealous advocates as being in direct conflict with our PCA decisions are simply not close enough to write about.
Appellant correctly observes that the decision of whether to write an opinion rests with the assigned panel of three judges. However, he does this court an injustice by saying that such decision is made "[u]pon the whim, or caprice" of the assigned judge or panel. He characterizes this procedure as "arbitrary, capricious, and irrational."
We wish to apprise the bar of some of the problems of this court in respect to requests by counsel for written opinions. In December 1982 a tenth judge was invested in this court, and the supreme court has certified to the legislature the need for two more judges during the current biennium. In re Certificate of Judicial Manpower, 428 So.2d 229 (Fla. 1983). The tremendous increase in this state's population has led to an avalanche of litigation. For example, in 1982 this court received 2,899 cases and disposed of 2,789. This left 1,694 cases on file by the end of the year, an increase of 110 more than the previous year.
Each appeal is assigned to a panel of three judges before being disposed of on the merits, so in 1982 each judge participated in the disposition of approximately 900 cases. It is imperative to recognize the limitations on the time judges have to write opinions. Commentators have suggested that a three-judge panel be limited to a caseload of 300 decisions per year with a participating judge expected to write about twenty-five opinions per year.[12] Judges on this court are each writing an average of sixty opinions per year. For example, in 1982 the court wrote opinions in 559 cases, an increase from 435 opinions written by the court in 1981. The fact is that most appellate judges enjoy opinion writing and would prefer to spend a much larger portion of their judicial time in researching and drafting than is possible under existing caseloads. But appeals are filed here as a matter of right, and in a court where each judge must participate in excess of 900 appeals per year, this luxury cannot be enjoyed.
We write opinions in all reversals and remands and, as noted, in affirmances where we believe an opinion will make a *1016 substantial contribution to the law, or where necessary to disclose conflict or certify questions. If it were not permissible to issue per curiam affirmances without opinion, the processing of appeals would be materially delayed. Further, we do not wish to write additional opinions to merely repeat well established principles and further burden attorneys with their research.[13] As it is, the volumes of the Southern Reporter are already growing at an extremely rapid rate, a rate which would be far greater if an opinion were written in every case.
We recognize that counsel would appreciate a reasoned opinion in deference to the quality of their advocacy. However, we also realize that "justice delayed is justice denied." Over the past three years, we have more strictly enforced time requirements and improved our administrative procedures. We take pride in the fact that as of May 5, 1983, our inventory of 1,477 cases included only forty, i.e., less than three percent of the cases on file, where no decision has been issued within one year from the filing of the notice of appeal. Today, the average processing time of cases orally argued and disposed of on the merits is approximately nine months, and those without oral argument are concluded in approximately eight months from the notice of appeal.
We hope that our remarks will cause counsel to more carefully consider the appropriateness of filing a motion for rehearing. Finally, we hope that our discussion of the workings of the court will give members of the bar a greater appreciation of our position when we affirm cases without writing an opinion.
REHEARING DENIED.
GRIMES, A.C.J., and SCHEB and RYDER, JJ., concur.
NOTES
[1] In 1982, for example, 13,924 appeals were filed and 13,976 disposed of in the district courts of appeal, while 1,465 cases were filed and 1,439 disposed of in the supreme court. Statistics for 1982 filings and dispositions of the supreme court and district courts of appeal furnished by Office of State Courts Administrator.
[2] First Annual Report of the Judicial Council of Florida at 14 (June 30, 1955).
[3] Fourth Annual Report of the Judicial Council of Florida, Ex. # 3 (June 30, 1957).
[4] See, e.g., Gaines, The Pending Amendment Will Enhance Regard For Judicial System, 30 Fla.B.J. 142 (1956); Pennekamp, A Personal Obligation, 30 Fla.B.J. 136 (1956); Ansin v. Thurston, 101 So.2d 808, 810 (Fla. 1958); Lake v. Lake, 103 So.2d 639 (Fla. 1958); Karlin v. City of Miami Beach, 113 So.2d 551 (Fla. 1959).
[5] See Note, The Erosion of Final Jurisdiction In Florida's Courts of Appeal, 21 U.Fla.L.Rev. 375 (1969).
[6] Sixth Annual Report of Judicial Council of Florida, Ex. III (June 30, 1960).
[7] Twenty-Fifth Annual Report of the Judicial Council of Florida at 22 (Feb. 1, 1980).
[8] This amendment was actively supported by six of the seven justices of the supreme court, the governor, the attorney general of Florida, The Florida Bar, and by the Conferences of District Court, Circuit Court, and County Court Judges. It was endorsed by many civic organizations, and generally by the media of this state. See England, Hunter & Williams, Constitutional Jurisdiction Of The Supreme Court Of Florida: 1980 Reform, 32 U.Fla.L.Rev. 147, 159-60 (1980).
[9] Art. V, § 3(b)(3), Fla. Const., as amended 1980.
[10] Art. V, § 3(b)(4) & (5), Fla. Const., as amended 1980.
[11] Overton, Relieving An Overworked State Supreme Court: Florida Asks Its Courts Of Appeal To Assist In Screening Cases, 66 Judicature 371, 374 (March 1983).
[12] Carrington, Meador & Rosenberg, Justice On Appeal, 143-45 (1976); Florida High School Activities Assoc. v. Bradshaw, 369 So.2d 398, 401, n. 1 (Fla. 2d DCA 1979).
[13] City of Miami Beach v. Poindexter, 96 Fla. 811, 119 So. 136 (1928).