780 So.2d 94 (2000)
Floyd Thomas ROBERTSON, Appellant,
v.
The STATE of Florida, Appellee.
No. 3D98-2383.
District Court of Appeal of Florida, Third District.
April 12, 2000.
*95 Bennett H. Brummer, Public Defender, and Manuel Alvarez, Assistant Public Defender, for appellant.
Robert A. Butterworth, Attorney General, and Margaret A. Brenan, Assistant Attorney General, for appellee.
Before GERSTEN, FLETCHER, and SORONDO, JJ.
FLETCHER, Judge.
Floyd Thomas Robertson appeals his judgment and sentence, rendered after a jury trial, for second degree murder arising out of the shooting death of his girlfriend. We agree with the defendant that the trial court reversibly erred when it allowed the prosecutor to introduce inadmissible testimonial evidence of a prior uncharged incident of threatening behavior by the defendant.
Robertson was charged with second degree murder after he reported that his girlfriend had been shot. Police arrived at the scene to find the girlfriend expiring in the bedroom with a chest wound, and the defendant claiming that the .40 caliber Ruger with which she was shot accidentally went off as he took it from the bedroom closet to clean it. At trial, the court allowed the prosecutor on cross-examination to ask the defendant, after defense objection that the question was outside the scope of direct examination, if he had ever threatened anyone with a weapon. The defendant stated he had not. The trial court then allowed the State to call the defendant's ex-wife as a rebuttal witness to impeach that testimony, again over defense objection. The ex-wife testified that six years earlier, the defendant had become angry with her and brandished a loaded AK-47 at her and their daughter.[1] The jury subsequently found the defendant guilty of shooting his girlfriend.
Section 90.404(2)(a), Florida Statutes (1998) provides that evidence of collateral crimes, wrongs, or acts committed by the defendant is admissible if it is relevant to a material fact in issue; such evidence is not admissible where its sole relevance is to prove the character or propensity of the accused. See Czubak v. State, 570 So.2d 925, 928 (Fla.1990)("It is improper for the prosecution to inquire about collateral crimes committed by the defendant that are unconnected with the crime for which the defendant is on trial and are not relevant to a material fact in issue."), review denied, 652 So.2d 816 (Fla.1995); Castro v. State, 547 So.2d 111, 114-15 (Fla.1989); Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959). In this instance, the evidence of the incident occurring six years earlier was not relevant to any material fact in issue in the current charge against the defendant.[2]
Section 90.405, Florida Statutes (1998), provides that character may be proved by reputation or by specific instances of conduct, but only when that evidence is admissible or when character is an essential element of a charge, claim, or defense. The comments to section 90.405 explain that,
"The section [§ 90.405, Methods of proving character] confines the use of specific instances of conduct to cases in which character is in issue; that is, when character is one of the facts necessary to establish a liability or defense or is a factor in the measurement of damages. *96 When character is used circumstantially and hence occupies a lesser status in the case, proof may be only by reputation and opinion. Of the three methods of proving character provided by this section, evidence of specific instances of conduct is the most convincing. At the same time it possesses the greatest capacity to arouse prejudice, confuse, surprise, or consume time. Consequently, the use of evidence of this kind is confined to cases in which character is, in the strict sense, in issue, and hence deserving of a searching inquiry. This treatment of specific instance of conduct, as well as the treatment of reputation, follows conventional contemporary common-law doctrine." [emphasis supplied]
In this instance, Robertson's character was not, in the strict sense, at issue: character was neither an essential element of the offense of second degree murder, nor was it an essential element of the defense where Robertson maintained that the shooting was accidental. The question by the prosecutor was solely relevant to establish the defendant's bad character, and erroneous admission of the ex-wife's testimony "is presumed harmful error because of the danger that a jury will take the bad character or propensity for crime thus demonstrated as evidence of guilt of the crime charged." Straight v. State, 397 So.2d 903, 908 (Fla.), cert. denied, 454 U.S. 1022, 102 S.Ct. 556, 70 L.Ed.2d 418 (1981); see Williams at 662-63; Gonzalez v. State, 559 So.2d 748 (Fla. 3d DCA 1990); Castro at 114; State v. Lee, 531 So.2d 133 (Fla. 1988); Harris v. State, 427 So.2d 234 (Fla. 3d DCA 1983).
The state's argument that the evidence was for impeachment purposes must fail where that impeachment could not have occurred without the defendant first affirmatively putting his character at issue, which the record indicates did not occur. See Bates v. State, 422 So.2d 1033 (Fla. 3d DCA 1982)(It is fundamental that the prosecution may not impugn the character of an accused unless the accused first puts character into issue at trial.) Contrary to the State's contention, the record shows that the defendant did not "open the door" to such questioning because the defendant did not voluntarily put the nature of his character at issue prior to the prosecutor's cross-examination. Those instances where courts have allowed impeachment through evidence of prior bad conduct involve situations where the defendant affirmatively offered deceptive testimony. The defendant here did not offer testimony about his good character, or make any claims of being nonviolent, and his claim that the shooting was accidental did not implicate any character trait on the defendant's part. It is well settled that
"[t]he prosecution in a criminal case cannot call witnesses to impeach the character of the defendant, unless the defendant puts it in issue. Nor can the prosecution accomplish the same forbidden end by indirection through pursuing a method of questioning defendant and his witness on cross examination that is principally designed, by means of innuendo and suggestions of general criminality on accused's part, to lead the jury to believe that the accused should be found guilty of the particular crime charged, because of his being suspected or accused of other offenses, or because of his connections or association with other accused persons under indictment for different crimes not constituting part of the charge on trial."
Foy v. State, 115 Fla. 245, 155 So. 657 (1934). The prosecutor committed the very error denounced in Foy.
We have conducted a harmless error analysis in this case and cannot conclude that the improperly admitted evidence was harmless beyond a reasonable doubt. As a result, we find that the defendant is entitled to a new trial.
Reversed and remanded for new trial.
*97 SORONDO, J. (concurring).
I agree with Judge Fletcher's opinion and write separately only to address the dissent and the issues raised therein.
The dissent begins by praising the "struggle" of our trial judges and asserts that "their difficult discretionary decisions should be commended in the absence of a showing of abusenot reproved." The word reproof is defined as "the act, an instance, or an expression of reproving; a rebuke." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1532 (3d ed. 1996). Having read Judge Fletcher's opinion carefully, I can find nothing therein which in any way "reproves" the trial judge in this case. Nor am I willing to accept the premise that a reversal of a lower court's rulings constitutes such a rebuke. In Whipple v. State, 431 So.2d 1011, 1014 (Fla. 2d DCA 1983), the Court defined our role as follows:
Under our present constitutional scheme, the district courts of appeal engage primarily in the so-called error-correcting function to insure that every litigant receives a fair trial.
If such is this Court's purpose, and I agree that it is, then a reversal based upon the commission of a perceived error, absent a specific admonishment of the trial judge, cannot possibly be interpreted as a rebuke of the lower court. Likewise, a reversal of a District Court's decision by the Florida Supreme Court does not constitute a rebuke of the judges on the District Court panel.
Next, the dissent states: "[The victim's] life was senselessly ended and now she will never have the chance to see her friends or family again or to know her grandchildren." In a footnote to this sentence, the dissent sets forth the victim's daughter's emotional statements to the trial judge at sentencing. The senselessness of the victim's death, like the death of all homicide victims, whether the killing occurred in a domestic setting or not, is apodictic. Neither the defense nor the state has challenged the enormity of the suffering endured by victims of violent crimes and their families. This tragic reality, however, is not relevant to the issue of the admissibility of the evidence in question. Likewise, the victim's daughter's emotionally moving statement at the sentencing hearing, although clearly permissible, see Art. I, § 16(b), Fla. Const.; § 921.143, Fla. Stat. (1997), and definitely relevant to sentencing, is not relevant to the issue presently before this Court.
Moving now to the substantive issue before the Court, section 90.404(2)(b), Florida Statutes (1997), requires that the state provide the defense with notice of intent to rely on similar fact evidence of other crimes, wrongs or acts, ten days before trial. The state provided no such notice in this case. A fact which, given the state's usual aggressive pursuit of this type of evidence, suggests that it did not believe the evidence in question was admissible under the rule. Nevertheless, the fact that the state did not seek to introduce the evidence during its case-in-chief is not dispositive on the issue of admissibility, as strategic considerations may have taken part in the decision.
The dissent takes the position that the evidence in question here was proper under section 90.404(2)(a). I strongly disagree. Preliminarily, it is important to emphasize that the Williams[3] rule evidence in this case involves a prior bad act or crime allegedly committed by the defendant against someone other than the victim in the present case. I stress that the analysis which follows does not apply to cases where the accused's prior misconduct was directed against the same victim as in the charged offense. It appears that most courts, for good reason, are far more likely to admit collateral crime evidence such as that in this case, when such prior *98 crime(s) was committed against the victim in the charged offense.[4]
In support of its position, the dissent cites five out-of-state cases. Of those cases, two, People v. Hawker, 215 A.D.2d 499, 626 N.Y.S.2d 524 (1995), and State v. Smith, 868 S.W.2d 561 (Tenn.1993), are not applicable to the present analysis because they deal with instances where the defendant's prior misconduct was directed towards the same victim as in the charged offense. The other three cases deal with prior misconduct against different victims, and, as the dissent notes, allow its admission. These three cases, however, do not represent a unanimous view.[5] Indeed, it appears that our nation's courts are divided on this issue.
In Knick v. Commonwealth, 15 Va.App. 103, 421 S.E.2d 479 (1992), a case which is virtually identical to the present one, the defendant, a deputy sheriff, was convicted of second degree murder in the shooting death of his wife. Defendant claimed that in an effort to frighten her, he pointed his service revolver at his wife. He testified that she pushed herself up from the floor where she was sitting and grabbed the barrel of the gun. Her actions, he testified, caused him to fall forward and the gun accidentally discharged and killed her.
In its rebuttal case, the prosecution introduced evidence that the defendant had, on two occasions, assaulted his ex-wife by pulling his service revolver, pointing it at her head and threatening to kill her. Evidence was introduced that on the second occasion the defendant also choked his ex-wife.
The Court reversed defendant's conviction saying:
We hold that the trial court erred in admitting this evidence because it did not tend to disprove defendant's contention that he accidentally discharged the firearm. It merely showed that the accused was guilty of prior bad acts and that he was disposed to commit an offense similar to that charged.
Knick, 421 S.E.2d at 480. I agree with this decision and similarly believe that the sole purpose served by the evidence at issue here was to establish that the defendant had a propensity to commit violent crimes with firearmsa clearly impermissible purpose. I therefore conclude that evidence of the defendant's prior misconduct against his former wife was not admissible in this case under section 90.404(2)(a), either in the state's case-in-chief or as impeachment or rebuttal under section 90.404(2)(b).[6]
*99 Before moving on to the other aspects of my analysis, I stop to observe that under section 90.404(2)(a), no evidence of collateral crimes is admissible unless the trial court is persuaded by clear and convincing evidence that such crimes were, in fact, committed. See State v. Norris, 168 So.2d 541, 543 (Fla.1964); Audano v. State, 641 So.2d 1356, 1358-59 (Fla. 2d DCA 1994); Chapman v. State, 417 So.2d 1028, 1031 (Fla. 3d DCA 1982). This requirement is the same whether the collateral crimes are presented in the state's case-in-chief after compliance with the notice requirement of section 90.404(2)(b), or whether they are introduced for impeachment or rebuttal. There is no indication in this record that the trial judge ever made such a determination. However, because the defendant did not raise this issue below it is waived.
There are only two remaining issues in this case, first, whether evidence of the defendant's alleged prior misconduct was admissible under sections 90.608, 90.609 or 90.610, Florida Statutes (1997), which also provide for impeachment with the use of character evidence.
The exchange between the prosecutor and the defendant during cross-examination was the following:
Q. [State]: In fact, you are familiar with large assault rifles, weren't (sic) you?
A. [Defendant]: Several models, yes sir.
Q. [State]: In fact, you purchased an AK-47, didn't you?
[Defense Counsel]: Objection, Judge
. . .
[Court]: Overruled.
Q. [State]: Isn't that correct, Mr. Robertson?
A. [Defendant]: Yes, right after Hurricane Andrew I did.
Q. [State]: And in fact, isn't it a fact that you have threatened people with assault rifles before?
[Defense Counsel]: Objection, Your Honor ...
[Court]: Overruled. You can answer "yes" or "no", sir.
A. [Defendant]: No.
Q. [State]: You have never threatened anyone close to you with an AK-47, Mr. Robertson?
A. [Defendant]: I have never threatened anybody close to me with a weapon, anybody period, with a weapon, sir.
At no time during his direct examination did the defendant raise the existence of an AK-47 assault rifle or place his character at issue in any way. The prosecutor's question was totally impermissible. First, it was clearly beyond the scope of direct examination. More significantly, the question constitutes improper impeachment. In effect, the prosecutor's question expressly asked the defendant whether he had ever previously committed an aggravated assault with a firearm. In addition to section 404(2)(a), the dissent relies on section 90.608(5), which reads as follows:
Any party, including the party calling the witness, may attack the credibility of a witness by:
Proof by other witnesses that material facts are not as testified to by the witness being impeached.
*100 Subsection (5) of this statute does not apply to this analysis because subsection (3) specifically addresses the issue of attacking the credibility of a witness by attacking that witness's character, which is what happened in this case. Section 90.608(3) specifically states that character can only be attacked in accordance with the provisions of section 90.609 or 90.610.
In further support of its section 90.608(5) argument, the dissent relies on C.M. v. State, 698 So.2d 1306 (Fla. 4th DCA 1997), and Ashcraft v. State, 465 So.2d 1374 (Fla. 2d DCA 1985). These cases are clearly distinguishable from the present case. In C.M., the arresting officer testified that after she spoke to the victim and received a description of the defendant she found defendant approximately three blocks away. She further testified that when defendant saw her police car, he ran.
C.M. testified that he ran from the police because he thought he was being sought by them for skipping school. On cross-examination the prosecutor asked him whether he had seen any officers earlier that day. C.M. stated that he had not.
On rebuttal, the arresting officer testified that she had seen C.M. earlier the same day and actually had contact with him. At that earlier time, C.M. did not flee when approached by the police.
The defense objection in C.M. was that the officer's rebuttal testimony constituted impermissible impeachment on a collateral matter. The objection was overruled and the trial court accepted the state's argument that the rebuttal testimony went to the defendant's truthfulness and also to discredit his explanation for fleeing when he saw the police. The appellate court affirmed, holding that "C.M.'s flight was a `material fact' within the meaning of section 90.608(5), because it was circumstantial evidence that he attempted to rob the victim ..." C.M., 698 So.2d at 1307.
C.M. is distinguishable from the present case in that it does not involve impeachment with the use of character evidence. This alone makes it totally irrelevant to the present analysis. Additionally, C.M. explained on direct examination his reason for fleeing from the police. It was therefore perfectly permissible for the state to pursue that line of questioning in cross-examination. Finally, the state's question on cross-examination was not an improper question on a generally forbidden subject as was the question in the present case.
In Ashcraft, the state introduced evidence of the specific nature of the defendant's prior conviction, rape. It argued that the defendant opened the door to this evidence by testifying that he had never hurt anyone. The Second District Court of Appeal characterized what happened in the lower court as follows:
In his testimony on direct examination defendant undertook to relate to the jury what occurred on the date of the crimes for which he was on trial but digressed and referred to prior crimes. In doing so defendant misled the jury by saying that he had never hurt anyone during those prior crimes.
Ashcraft, 465 So.2d at 1375 (emphasis added). The Court went on to affirm the defendant's conviction. Although this case did involve character evidence, the state was allowed to impeach the defendant in a manner that would ordinarily be impermissible because the defendant opened the door to such questioning during his direct-examination. I further note that Ashcraft does not rely upon or even mention section 90.608(5).
Section 90.609 provides for attacking or supporting "the credibility of a witness, including the accused, by evidence in the form of reputation." This statute is clearly not at issue as this is not what the state sought to do below.
Section 90.610(1), provides:
A party may attack the credibility of any witness, including an accused, by evidence that the witness has been convicted of a crime if the crime was punishable *101 by death or imprisonment in excess of one year under the law under which the witness was convicted, or if the crime involved dishonesty or a false statement regardless of the punishment
. . .
As concerns the scope of this section, in Britton v. State, 604 So.2d 1288, 1290 (Fla. 2d DCA 1992), the Court stated:
Generally, impeachment concerning a defendant's prior convictions is limited to two questions. The first question establishes that the defendant has committed a felony or other offense involving dishonesty or false statement. If the defendant admits such a conviction, then the prosecutor can establish the number of such prior convictions.
(Citation omitted). Accordingly, if the prosecutor was seeking to impeach the defendant's credibility under section 90.610(1), he could only have asked the two questions set forth in Britton.[7] He would not have been at liberty to inquire about the specific nature of the prior convictions. See Martin v. State, 86 Fla. 616, 620, 98 So. 827, 829 (1924)(explaining that it is not a question of what crime a witness may have committed, but whether that witness has been convicted of any crime which should affect his credibility). The Florida Supreme Court has further noted that "evidence of particular acts of misconduct cannot be introduced to impeach the credibility of a witness." Watson v. Campbell, 55 So.2d 540, 541 (Fla.1951); Fulton v. State, 335 So.2d 280 (Fla.1976). It is therefore clear that impeachment under section 90.610(1) was not proper.
As noted by Judge Fletcher's opinion, the defendant did not place his character at issue during his direct-examination. Nor did he place it at issue by gratuitously volunteering favorable information during cross-examination. He, therefore, did not "open the door" to the alleged prior crime introduced against him. Accordingly, the sole and extremely narrow issue remaining, is whether the state can, by asking a blatantly improper question on cross-examination, open the door to otherwise inadmissible character evidence under the guise of impeachment or rebuttal. The answer is a resounding and inescapable, no.
Ironically, one of the cases the dissent cites as an example for Florida to follow addressed the identical issue presented here. In State v. Grubb, 111 Ohio App.3d 277, 675 N.E.2d 1353 (1996), the Court rejected the very argument endorsed by the dissent. There, the state argued that the defendant's testimony that he was a peaceful person opened the door to the introduction of two incidents where the defendant assaulted his former wife during their marriage. The Court stated:
Defendant did not testify on direct examination that he is a peaceful person or that he has never assaulted any woman, including his former wife. Rather, it was the state that elicited that testimony from defendant on cross-examination by the use of specific questions designed for just that purpose. The defense objected, unsuccessfully, to that questioning. Because defendant made no claim at trial regarding his own good character, i.e., did not put his character in issue, the testimony of defendant's former wife, ..., was not admissible ... to rebut same. The prosecution cannot circumvent the limited nature of [the rule] by putting the character of an accused in issue via its own questions, and then present evidence to rebut the answers.
Id. at 1355. (Citations omitted). Although the Court ultimately allowed the introduction of the other crime evidence, it did so on other grounds and not because the defendant had placed his character at issue. Id. at 1356.
*102 Florida has embraced the same reasoning. In Bozeman v. State, 698 So.2d 629 (Fla. 4th DCA 1997), the Court stated:
To open the door to evidence of prior bad acts, the defense must first offer misleading testimony or make a specific factual assertion which the state has the right to correct so that the jury will not be misled.... The "opening the door" concept is based on considerations of fairness and the truth-seeking function of a trial, where cross-examination reveals the whole story of a transaction only partly explained in direct-examination.

Id. at 630-31 (emphasis added). See McCrae v. State, 395 So.2d 1145 (Fla. 1980)(where defense counsel's questioning communicated the erroneous impression that defendant's prior convictions were inconsequential, the state was properly permitted to elicit the nature of the defendant's prior felony conviction on cross-examination); Allred v. State, 642 So.2d 650 (Fla. 1st DCA 1994)(by testifying that he lacked a violent propensity and asserting that he had never hit a woman, defendant opened the door to rebuttal evidence that he had previously physically assaulted his former wife and a girlfriend); Fletcher v. State, 619 So.2d 333 (Fla. 1st DCA 1993)(where defendant testified during his direct examination that he had never pointed a gun at anybody and that he was a responsible user of firearms, the state was properly allowed to introduce evidence of an episode wherein the defendant used a firearm recklessly); Brown v. State, 579 So.2d 898 (Fla. 4th DCA 1991)(where defendant tried to enhance his credibility by telling the jury that he had been a law enforcement officer, the trial court properly allowed the state to bring out on cross-examination that defendant had been fired from his job as a corrections officer); Hernandez v. State, 569 So.2d 857 (Fla. 2d DCA 1990)(where, during cross-examination, defendant volunteered statements that he had never done any drug related deals in his life, he opened the door to questioning about a heroin deal he had arranged two days prior to the instant offenses); Dodson v. State, 356 So.2d 878, 879 (Fla. 3d DCA 1978)(where questions on direct examination of defendant created a basis for inference that there was one prior conviction for auto theft and that there were other crimes, i.e., crimes other than theft, the state was properly allowed to clarify on cross-examination that the "other crimes included auto theft and theft of other properties"); Davis v. State, 216 So.2d 87 (Fla. 2d DCA 1968)(The trial court did not err in allowing the state to cross-examine defendant about charges of exhibiting a dangerous weapon where, on direct examination, defendant had repeatedly asserted that he never possessed firearms of any nature since moving to Sarasota).
Based on the cases set forth above, I conclude, as did then Judge, now Justice Barbara Pariente in her concurring opinion in DeFreitas v. State, 701 So.2d 593, 605 (Fla. 4th DCA 1997), that "it is ... difficult to understand how the state can claim that defendant opened the door when it was the prosecutor who asked the series of impermissible questions concerning prior acts of misconduct on cross-examination."
GERSTEN, J. (dissenting).
I respectfully dissent. In my view, the facts support the jury's verdict of second degree murder and the trial court properly permitted the impeachment testimony of the defendant's ex-wife.
Our trial judges struggle daily with the numerous difficult aftereffects of the increasing domestic violence epidemic within our communities. Their duty as judges is to serve both the law and justice.[8] In that regard, their difficult discretionary decisions *103 should be commended in the absence of a showing of abusenot reproved. I am concerned that the majority opinion constitutes a serious setback in Florida's jurisprudential progress, and sends the wrong message to our trial court colleagues.
Many states allow prior misconduct evidence in domestic violence cases as probative of intent, to rebut allegations by the defendant that the injuries suffered by the victim were the result of a mistake. See generally, People v. Sims, 110 A.D.2d 214, 494 N.Y.S.2d 114 (1985)(evidence admissible to prove absence of mistake); Wetta v. State, 217 Ga.App. 128, 456 S.E.2d 696 (1995) (testimony by defendant's prior girlfriend that he abused her as well was admissible to show defendant's state of mind); People v. Hawker, 215 A.D.2d 499, 626 N.Y.S.2d 524 (1995)(allowing testimony by children in murder case who witnessed the defendants' prior assaults on their mother to show motive, intent, and that murder was continuation of pattern rather than merely product of self defense); State v. Grubb, 111 Ohio App.3d 277, 675 N.E.2d 1353 (1996)(former wife's testimony admissible to prove intent and lack of accident, where defendant was charged with domestic violence and claimed injuries were accidental); State v. Smith, 868 S.W.2d 561 (Tenn.1994)(evidence of two prior unconvicted charges for assault were relevant and admissible to establish motive for murderevidence of old threats relevant to show malice, premeditation and defendant's state of mind). There is no principled reason for Florida to follow a different ruleespecially under the facts of this case.
The circumstances in this case are most disturbing. Maria Nelson was shot to death by the defendant, a former military gun and poisonous snake enthusiast, after she asked him to move out of her apartment. Maria's life was senselessly ended and now she will never have the chance to see her friends or family again or to know her grandchildren.[9]
On September 16, 1996, Maria confided to a co-worker that she was having problems with the defendant and was going to ask him to move out of her apartment that night. Maria was upset and nervous. Approximately three hours later, the local fire rescue department received a call from the defendant, who stated that he had shot "someone." When the police arrived, the defendant led them into a bedroom where a gun was laying on the floor with the slide locked. A police detective observed that the defendant had secured the gun.
Victim Maria Nelson was lying on the bed semi-conscious. The police detective tore off her shirt to see if he could provide medical help. Although the defendant had a medical background as a paramedic, *104 there was no evidence that the defendant had tried to perform any kind of aid on Maria. Maria was airlifted to the hospital where she eventually died.
The defendant was charged with second degree murder. At trial, his theory of innocence was that the gun accidentally misfired while he was taking it out of the closet to clean it.[10] The State's theory of the case was that the defendant shot Maria during a domestic argument and that the shooting was not accidental. Since the defendant was the only witness to the shooting, the critical issue for the jury to determine was whether the defendant's story was credible.
Several of Maria's neighbors testified they heard loud thuds coming from the apartment on the evening of the shooting, as if someone were being thrown against the wall. At one point, the defendant was observed going out onto the balcony and flailing his arms around as if involved in a heated discussion. The defendant then went inside the apartment and Maria came out onto the balcony. A few minutes after Maria went back into the apartment, the neighbors heard a gunshot.
The arresting detective who took the defendant's statement stated that the defendant's version of what occurred varied. At the police station, the defendant stated he and Maria had an argument that evening, but that he had never gotten physical with Maria. The defendant explained he was taking out his .40 caliber Ruger handgun to clean it, when his finger slipped on the trigger of the gun and Maria was shot.[11] Thereafter, the defendant testified that his relationship with Maria was an excellent one and that they had not been fighting on the day of the shooting.
A friend of the defendant's, Steve Angene, testified that the defendant had called Steve after the shooting. In that phone call, the defendant stated he had been having a dispute with Maria, and that Maria had followed him into the bedroom. The defendant explained that his gun was cocked because he had heard high winds outside the door which sounded as if someone were trying to enter the apartment. Steve testified that winds did not access the front door because it is an interior door. The defendant then asked Steve not to mention the fights he had with Maria to the police.
After explicitly testifying the shooting was accidental, the defendant then testified during cross-examination that he had never threatened anyone close to him with a weapon.[12] Based upon this statement, the State called the defendant's ex-wife as a rebuttal witness. The trial court noted: "If your client lied on the witness stand *105 and he has proof that your client lied on the witness stand, he is entitled to show that. That is the dangers of testifying." The defendant's ex-wife then testified the defendant had threatened her with a gun.
In my view, the defendant's use of a gun to threaten another woman in a moment of anger was relevant and material. Evidence of other crimes or acts is admissible if it is relevant. Heiney v. State, 447 So.2d 210 (Fla.), cert. denied, 469 U.S. 920, 105 S.Ct. 303, 83 L.Ed.2d 237 (1984). The test for relevancy is whether such evidence "casts light upon the character of the act under investigation by showing motive, intent, absence of mistake, common scheme, identity or a system or general pattern of criminality so that the evidence of the prior offenses would have a relevant or a material bearing on some essential aspect of the offense being tried." Williams v. State, 110 So.2d 654, 662 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959).
Here, the critical issue at trial was whether the defendant accidentally shot Maria. The question by the prosecutor was relevant to show the defendant's "motive, intent, absence of mistake, common scheme, identity or a system or general pattern of criminality." See § 90.404(2)(a), Fla. Stat. (1997); State v. Grubb, 675 N.E.2d at 1353. Specifically, the question was relevant to the defendant's claim that he was "cleaning" the gun which "accidentally" discharged while arguing with Maria, as opposed to "threatening" Maria with the gun when she was shot and killed.[13] Therefore, I would find the prosecutor's question was proper under Section 90.404(2)(a), Florida Statutes (1997).
For similar reasons, I would find the ex-wife's impeachment testimony was also proper, and that no notice was required by the State under Section 90.404(2)(b), Florida Statutes (1997). Here, the ex-wife's rebuttal testimony was relevant to show the defendant's lack of truthfulness and to contradict his direct statements to the contrary that he had never threatened anyone with a gun. See § 90.608(5), Fla. Stat. (1997); C.M. v. State, 698 So.2d 1306 (Fla. 4th DCA 1997); Ashcraft v. State, 465 So.2d 1374 (Fla. 2d DCA 1985).
In other words, once the defendant testified he had never threatened anyone with a gun, he opened the door to questioning about the prior incident where he had threatened his ex-wife with a gun. See Fletcher v. State, 619 So.2d 333 (Fla. 1st DCA), review denied, 629 So.2d 132 (Fla. 1993); Hernandez v. State, 569 So.2d 857 *106 (Fla. 2d DCA 1990). The State was then entitled to impeach the defendant's statements and to show that he was not being truthful on the stand. See Ivey v. State, 132 Fla. 36, 180 So. 368 (1938); Lusk v. State, 531 So.2d 1377 (Fla. 2d DCA 1988).
It is important for the legal profession and the judiciary to send a strong message that domestic violence in our communities will not be tolerated.[14] In my view, Judge Levenson correctly applied the law, correctly admitted the rebuttal testimony, and correctly held the defendant accountable for his actions. I would affirm the judgment and sentence for second degree murder.
NOTES
[1] There was no corroborative evidence of the ex-wife's testimony as to this six-year-old incident.
[2] Although the similar fact evidence permitted by the rule includes absence of accident, we do not believe that the six-year-old act testified to by the ex-wife is either similar to the instant event or relevant to prove that the instant event was not an accident. Indeed were the testimony admissible the defendant would find himself defending against not only the instant charge but also against the six-year-old uncharged incident.
[3] Williams v. State, 110 So.2d 654 (Fla.1959).
[4] See generally Gattis v. State, 637 A.2d 808 (Del.1994); People v. Illgen, 145 Ill.2d 353, 164 Ill.Dec. 599, 583 N.E.2d 515 (1991); Monegan v. State, 721 N.E.2d 243 (Ind.1999); State v. Williams, 672 So.2d 1150 (La.Ct.App. 1996); State v. Danikas, 11 S.W.3d 782 (Mo. Ct.App.1999); People v. Hawker, 215 A.D.2d 499, 626 N.Y.S.2d 524 (1995); People v. Johnson, 213 A.D.2d 675, 624 N.Y.S.2d 206 (1995); State v. Smith, 868 S.W.2d 561 (Tenn. 1993); Abbott v. Commonwealth, 2000 WL 29992 (Va.Ct.App. Jan.18, 2000).
[5] See generally Abernathy v. State, 325 Ark. 61, 925 S.W.2d 380 (1996); Johnson v. State, 655 N.E.2d 502 (Ind.1995); Hoes v. State, 35 Md. App. 61, 368 A.2d 1080 (1977); State v. LaFreniere, 85 Ohio App.3d 840, 621 N.E.2d 812 (1993); State v. Pyle, 155 Or.App. 74, 963 P.2d 721, review denied, 328 Or. 115, 977 P.2d 1171 (1998).
[6] I do not suggest that evidence of violence against a victim other than the one in the charged offense is never admissible. The law is clear that the relevance of collateral crimes is directly related to the level of similarity between the collateral crime and the charged offense. See Bryan v. State, 533 So.2d 744 (Fla.1988). This general principle, however, does not bar the admission of prior dissimilar crimes if they are relevant. See id. at 746; Sexton v. State, 697 So.2d 833 (Fla.1997). Nevertheless, similarity between the collateral crime and the charged offense significantly enhances its relevance. If, for example, the defendant in this case had not only aimed the AK-47 at his ex-wife but actually discharged the firearm while aiming it at her, and subsequently defended himself by claiming accident, the result in this case may well have been different. Clearly, the existence of more than one such "accident" reasonably gives rise to the inference that they were not "accidents" at all.

The defendant in this case was charged with the completed, violent offense of second degree murder. The prior, alleged misconduct was an offense which threatened violence. Although such a prior threat against the victim in this case may have been admissible to show intent and the absence of mistake or accident, the same cannot be said of a threat against another. Reducing these events to their simplest and most common formif the defendant had been charged with aggravated battery by punching his wife in the nose and breaking it, and he defended by claiming that he accidentally struck her while flailing his arms during an argument, under the dissent's reasoning, evidence that the defendant had threatened to punch his ex-wife in the nose six years earlier would be admissible to rebut his claim of accident. I cannot agree to this line of reasoning. In my view, this type evidence impermissibly serves to prove propensity and whatever relevance it may have is overwhelmingly outweighed by its unfair prejudice.
[7] The record does not reflect whether the prior bad act at issue resulted in an arrest or conviction.
[8] "You're gonna have to serve somebody." Bob Dylan, "Gotta Serve Somebody", on The Sopranos (Sony Music Entertainment, Inc. and Home Box Office 1999).
[9] The far reaching repercussions of this domestic violence tragedy are, unfortunately, best described in the words of Maria's daughter:

I would like to let you know how much I miss her. This man took my mother's life. She was not given the choice of a trial or how her life would go on, how it would be affected, nor the other people that would be affected by this murder.
My mom was loved by many people, not just her family. She had a way of making friends, always taking time out to listen to other people and get to know them. It's just overwhelming that I cannot see my mother ever again and that I have to remember her as I saw her in the hospital, already dead. I did not get a chance to say good-bye to her. I'm sure she knew how much I loved her, but I never got to say good-bye to her and tell her.
This has changed my life. I'm undergoing therapy currently for depression. I'm not able to do the things I was able to do before. It's affected my family life with my husband. And my mom will never get to know, if we ever have children, her grandchildren, and that is very sad because she was a beautiful person and all of us are missing out a great deal with her being gone.
I would like to ask you to give him the maximum sentence that you can. Although, it will not make up or bring her backsorry. It cannot bring her back. But she was not given a choice. Her life was just taken away from her.
[10] The detective at the scene testified that he did not find any cleaning materials, and that the trigger had to be pulled in order for the gun to fire. The medical examiner testified that the defendant's story to the police that the gun accidentally discharged, was not consistent with the angle of the bullet's path or the angle of the bed. The gun was moved by the defendant after he called 911. According to the defendant, he did not want the gun lying on the floor next to the victim when the police arrived.
[11] Later, the defendant testified that he was taking out the gun because he wanted Maria to see it. This was inconsistent with his earlier statement that he was cleaning the gun. A review of the record reveals the defendant's testimony was inconsistent on other matters as well. For example, the defendant testified that he lifted Maria up after shooting her and saw blood at the exit wound. However, when the police arrived there was no evidence the defendant had administered any medical aid, despite his background as an emergency medical technician and hemo-dialysis technician. There was no blood on the defendant's hands or clothes. Although there was a paramedic first aid kit in the apartment, the defendant had not placed any towels or medical supplies on Maria to stop her bleeding.
[12] The State asked: "You have never threatened anyone close to you with an AK-47, Mr. Robertson?" The defendant responded: "I have never threatened anybody close to me with a weapon, anybody, period, with a weapon, sir." The defendant also testified that he had a good relationship with Maria, and was not fighting with her on the day of the shooting.
[13] We note the similarity between this case and the prior incident admitted into evidence through the ex-wife's impeachment testimony. Both incidents involved the defendant's use of a semi-automatic weapon, which requires the weapon to be cocked and loaded in order to be fired. Significantly, the defendant testified during direct examination that the semi-automatic murder weapon was "accidentally" in a single-action mode (cocked and loaded). Thus the defendant raised the issue of intent when he testified that he "accidentally" stored the semi-automatic in a "cocked" position and that Maria was shot because his finger slipped on the trigger as he was removing the weapon from a closet.

With regard to this critical fact, I find State v. Grubb directly on point and supportive of affirmance. See State v. Grubb, 111 Ohio App 3d 277, 675 N.E.2d 1353 (1996). The defendant in Grubb claimed self-defense, and testified that his wife's injuries were "accidental." On rebuttal, the state introduced testimony of a former wife who stated the defendant had assaulted her during their marriage. The court held the former wife's testimony was admissible with respect to the issues of intent and lack of accident stating:
[The] defendant not only asserted a claim of self-defense but his testimony also raised an issue regarding whether his wife's injuries were "accidental" and not the result of any intentional (or knowing) conduct on his part. To that extent "intent" and "lack of accident," two matters specifically identified in Evid.R. 404(B), were in issue in this case. Accordingly, the state was entitled to utilize the evidence regarding defendant's assaults on his former wife pursuant to Evid.R. 404(B) not for the purpose of showing that on this occasion defendant acted in conformity with that character, but to prove his intent (culpable mental state) and the lack of accident, in this case.
I would find the impeachment testimony in the present case was similarly admissible.
[14] Two bills have been introduced, one in the House and one in the Senate, which would amend Section 90.404, Florida Statutes (1999), and specifically provide that evidence of prior acts of domestic violence by a defendant is admissible in certain criminal prosecutions involving domestic violence. See H.B. 1585 (2000)(introduced by Representative Betancourt) and S.B. 2244 (2000)(introduced by Senator Meek). The significance of this proposed amendment to Section 90.404, from an evidentiary standpoint, is profound because oftentimes the outcome of a domestic violence prosecution cannot rest upon the credibility of the victim who either recants, fails to appear or, as in the present case, is dead.

The introduction of prior domestic violence acts of the defendant thus becomes critical. Such evidence often means the difference between conviction and acquittal. Fortunately, it appears the legislature is recognizing and responding to the unique evidentiary concerns inherent in domestic violence prosecutions. The judiciary needs to do the same.